CARLTON, J.,
 

 for the Court:
 

 ¶ 1. Dale Williams
 
 [1]
 
 and Cathy Williams appeal the March 29, 2010, order of the Lowndes County Chancery Court which terminated Dale and Cathy’s parental rights with respect to six minor children. On appeal, Dale and Cathy argue that the chancellor erred in denying their motion to appoint indigent counsel to represent them at the hearing. Finding no error, we affirm the chancellor’s judgment.
 

 FACTS
 

 ¶ 2. On June 3, 2009, Wesley and Lindsey filed a petition in Lowndes County Chancery Court to adopt their nieces and nephews: Sarah Williams, born March 29, 1996; Michael Williams, born May 16, 1998; Paul Williams, born April 16, 2008; Jamie Williams, born July 12, 2004; Rachel Williams, born August 15, 2005; and Jimmy Williams, born September 23, 2006. The appellants, Dale and Cathy Williams, are the biological parents of the children.
 
 [2]
 
 Wesley and Dale are brothers.
 

 ¶ 3. On October 8, 2009, Dale and Cathy filed a response opposing the petitions for adoption, thereby necessitating a hearing to determine whether or not to terminate Dale and Cathy’s parental rights. On December 22, 2009, the chancellor appointed Rebecca Younger as the guardian ad litem. The chancellor conducted a hearing on March 23 and March 24, 2010. Dale and Cathy acted pro se, but they requested that the court appoint them an attorney because of their indigence. ■ Dale also requested a change of venue so that he could compel the attendance of witnesses from Georgia, where the original guardianship proceedings were held. The chancellor denied their requests and proceeded with the hearing.
 

 ¶ 4. At the hearing, Dale and Cathy reported a combined income of approximately $17,000 in 2007, and Dale testified that he made “a little bit more” than that amount in 2008. The record reflects that no tax returns or W2s were provided to prove any particular level of income. Dale stated that he and Cathy owned no assets of any worth. Dale also testified that Cathy did not have a job, but that she occasionally tried to sell scrap metal to help with the family’s expenses. Dale testified that Cathy lacked the ability to work full time because she had to care for Johnny, the couple’s infant. Dale provided pay stubs for January 2009 and February 2009 from his job at John’s Auto & Truck in Jonesboro, Georgia, where he works as a mechanic. The pay stubs showed that in January, Dale had been paid $2,000, and in February, he earned $1,300. Dale explained that he is “supposed to make $600 every week,” but that due to a lack of business, he had not been earning that amount. Dale testified that he works from 8:00 a.m. until 5:00 p.m., and he stated that he is too tired by the time he gets home from his job as a mechanic to consider working a second job to help earn money to pay for an attorney. The chancellor ultimately found that Dale and Cathy possessed the resources and ability to obtain counsel, but had failed to do so. There
 
 *784
 
 fore, the chancellor declined to appoint counsel for Dale and Cathy, and the chancellor proceeded with the hearing.
 

 ¶ 5. The chancellor admitted into evidence court records from Georgia which pertained to Dale and Cathy’s history with the Clayton County, Georgia, Department of Family and Children Services (CCDFCS) and Juvenile Court. Pursuant to a June 1, 2007 order of the Juvenile Court of Clayton County, Georgia, Wesley and Lindsey had been granted legal custody of all eight of the minor children. Wesley and Lindsey presented evidence showing that prior to the entry of the custody order, all eight of the children had been in the custody of the CCDFCS for the majority of the time since May 24, 2006. Wesley and Lindsey also presented evidence that the CCDFCS had an extensive history with Dale and Cathy’s failure to properly care for the children, their substance abuse, and the sexual abuse of the children. Dale and Cathy both testified at the hearing, and both denied all allegations of abuse.
 

 ¶ 6. During the hearing, testimony was presented by various expert witnesses regarding the severe sexual, mental, and physical abuse that the children suffered at the hands of Dale and Cathy, and the physical and emotional effect on the children. Macki Smith, a former special instructor with the Mississippi Department of Health’s Early Intervention program, provided testimony concerning Jimmy and Rachel’s delayed development. Smith also testified that she witnessed Wesley and Lindsey working with the children, and she stated that Wesley and Lindsey continued with the suggested therapy treatments for the children throughout the week. Smith stated that she observed positive changes and progress in Jimmy and Rachel’s developmental skills while in Wesley and Lindsey’s care.
 

 ¶ 7. Charlotte Teague, a licensed certified mental health therapist, provided testimony concerning Michael and Sarah’s mental state. Teague stated that when Sarah first came to see her, she was depressed, withdrawn, and having trouble in school. Teague also stated that Sarah displayed problems maintaining normal hygiene. Teague relayed that Sarah had informed her during a counseling session that much of her sexual abuse had occurred while she was in the bathtub, and as a result, she disliked bathing and disliked anyone touching her body. Teague testified that both children showed signs of past sexual abuse. Teague testified that Wesley and Lindsey had been very involved in Sarah and Michael’s counseling, and she observed improvements in the children’s mental health, grades, and self confidence while in Wesley and Lindsey’s care.
 

 ¶ 8. Dr. Pamela Sykes, a general pediatrician, provided testimony concerning the health of the children as well as their respective genetic abnormalities. The guardian ad litem also provided testimony from her report regarding what the Williams children had relayed to her regarding their unsanitary living condition while in the custody of their biological parents, as well as the horrific sexual abuse they suffered while living with Dale and Cathy in Georgia. The guardian ad litem informed the chancellor that Jordan and Kelly, two of the Williams children who were not the subject of the adoption petition, were currently institutionalized due to their severe mental and emotional problems stemming from abuse by Dale and Cathy. The guardian ad litem testified that the rest of the children were currently thriving and doing well in Wesley and Lindsey’s custody.
 

 ¶ 9. After the hearing, the chancellor entered an opinion and judgment ordering
 
 *785
 
 the termination of Dale and Cathy’s parental rights as to each of the six children, and granted full custody to Wesley and Lindsey. This appeal followed.
 

 STANDARD OF REVIEW
 

 ¶ 10. On appeal, this Court’s scope of review of the findings of a chancellor in domestic relations case is limited.
 
 Goodin v. Dep’t of Human Servs., State of Miss.,
 
 772 So.2d 1051, 1054 (¶ 6) (Miss.2000). Further, “[t]he findings of the chancellor will be overturned on appeal only if ‘manifestly wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard.’ No finding will be disturbed or set aside if supported by ‘substantial, credible evidence.’ ”
 
 Id.
 
 (internal citations and quotation omitted). However, whether Dale and Cathy received due process is a question of law, which this Court will review de novo.
 
 J.C.N.F. v. Stone County Dep’t. of Human Servs.,
 
 996 So.2d 762, 770 (¶ 27) (Miss.2008).
 

 DISCUSSION
 

 ¶ 11. Dale and Cathy’s sole assignment of error on appeal asserts that the chancellor violated their right to due process by failing to appoint counsel to represent them throughout the termination proceedings. Dale and Cathy cite
 
 Lassiter v. Department of Social Services of Durham County, North Carolina,
 
 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) to support their assertion that they were entitled to court-appointed counsel throughout the proceedings.
 

 ¶ 12. In
 
 Lassiter,
 
 the United States Supreme Court addressed the issue of whether an indigent parent is entitled to appointment of counsel in a termination of parental rights proceeding under the Due Process Clause of the Fourteenth Amendment.
 
 Lassiter,
 
 452 U.S. at 21-22, 101 S.Ct. 2158. The Supreme Court ultimately upheld the trial court’s termination of parental rights where the trial court failed to appoint counsel for an indigent parent.
 
 Id.
 
 In upholding the trial court’s decision, the Supreme Court specifically emphasized that the “the petition to terminate ... parental rights contained no allegations of neglect or abuse upon which criminal charges could be based; no expert witnesses testified; the case presented no specially troublesome points of law; [and] the presence of counsel could not have made a determinative difference for petitioner.”
 
 Id.
 
 at 19,101 S.Ct. 2158.
 

 ¶ 13. In
 
 K.D.G.L.B.P. v. Hinds County Department of Human Services,
 
 771 So.2d 907, 910 (¶¶ 11-12) (Miss.2000), the Mississippi Supreme Court discussed
 
 Lassiter
 
 in a case with similar facts to the case at bar. The supreme court in
 
 K.D.G.L.B.P.
 
 stated that “[o]ne of the most important factors to be considered in applying the standards for court appointed counsel is whether the presence of counsel would have made a determinative difference.”
 
 Id.
 
 at (¶ 12). Further, relying on the Supreme Court’s holding in
 
 Lassiter,
 
 our supreme court stated that the appointment of counsel in termination proceedings is wise but not mandatory, and courts should determine the need for court-appointed counsel on a case-by-case basis.
 
 Id.
 

 ¶ 14. The record before us reflects that the chancellor inquired extensively regarding Dale and Cathy’s finances before commencing the adoption proceedings. As stated, Dale and Cathy reported a combined income of approximately $17,000 in 2007, but they provided no tax returns to prove any particular level of income. Dale testified that he made “a little bit more” than that amount in 2008. Dale also testified that Cathy possessed no job, but that she occasionally tried to sell scrap metal to help with the family’s expenses. Dale testified that Cathy could not work full time
 
 *786
 
 because she bore the responsibility of caring for Johnny, the couple’s infant. Dale provided pay stubs from his job as a mechanic. His pay stubs showed that in January, Dale earned $2,000, and in February, he earned $1,300. Dale explained that he was “supposed to make $600 every week,” but that due to a lack of business, he had not been earning quite that amount. Dale testified that he is too tired by the time he gets home from his job as a mechanic to consider working a second job to help earn money. Dale stated that he could have probably afforded an attorney if he had not been ordered to turn over his $1,700 income tax return to Wesley and Lindsey for child support.
 
 [3]
 

 ¶ 15. Dale testified that he and Cathy tried to find a lawyer to represent them pro bono, but had no success. Dale also admitted that he could have asked his church for financial help to hire an attorney, but he stated that he felt like “this is something that I should do. I should be able to do it, and I should do it. I shouldn’t go beg to the church. I shouldn’t go beg to Uncle Sam.” After hearing extensive testimony from Dale regarding his and Cathy’s finances, the chancellor held that “although the [Williams] made an effort, I believe that they had resources and could have obtained a lawyer by now if they chose to. So I’m going to overrule your motion for a continuance and your motion to appoint counsel for you.” After reviewing the transcript, we find that the chancellor’s findings regarding Dale and Cathy’s ability and resources to hire legal counsel are supported by substantial, credible evidence.
 

 ¶ 16. Dale and Cathy, however, argue that the
 
 Lassiter
 
 factors support their need for court-appointed counsel. In turning to the first factor, whether the petition to terminate parental rights contained allegations of neglect or abuse upon which criminal charges could be based, Dale and Cathy claim that the petition for adoption states that the children experienced sexual abuse and horrific neglect while in the care of their parents, and they argue that if such accusations are corroborated and substantiated, then Dale and Cathy could face criminal charges. Therefore, in the face of potential criminal charges and jail time, they further argue that they needed legal counsel at the termination of parental rights hearing. However, the record reflects that the allegations of Dale and Cathy’s criminal conduct occurred in the State of Georgia and that Mississippi possessed no jurisdiction to prosecute any offenses arising in Georgia. We note that Mississippi Code Annotated section 93-27-109(1) (Rev.2004) provides that:
 

 A party to a child custody proceeding, including a modification proceeding, or a petitioner or respondent in a proceeding to enforce or register a child custody determination, is not subject to personal jurisdiction in this state for another proceeding or purpose solely by reason of having participated, or of having been physically present for the purpose of participating, in the proceeding.
 

 Moreover, the record reflects no pending charges in Georgia and also that a Georgia court had already deemed Dale and Cathy unfit parents after removing the children from their home. Thus, no Mississippi court possesses personal jurisdiction over Dale or Cathy with respect to any allegations of. criminal behavior that occurred in Georgia and had no subject matter jurisdiction over offenses occurring solely in another state. Additionally, upon our re
 
 *787
 
 view of the petition for adoption, we find the petition contains no allegations that Dale or Cathy abused the children.
 

 ¶ 17. Regarding the second
 
 Lassiter
 
 factor, Dale and Cathy assert that the only direct testimony offered by Wesley and Lindsey was from their expert witnesses, which included Smith, a former special instructor with the Mississippi Department of Health’s Early Intervention program; Teague, a licensed certified mental health therapist; and Dr. Sykes, a pediatrician. Dale and Cathy claim that the lack of counsel to assist them prejudiced their ability to represent their interests because they needed an attorney to scrutinize the credentials of the expert witnesses and file motions in limine as to the experts’ conclusions. However, Wesley and Lindsey point out that the Clayton County Juvenile Court previously determined that Dale and Cathy were unfit parents. Therefore, the experts’ testimony was primarily admitted to justify Wesley and Lindsey’s adoption of the children and the welfare of the children while in their care. Indeed, we note that the testimonies of Smith, Teague, and Dr. Sykes all mainly focused on the improvements of the children’s mental, physical, and emotional health while in the care of Wesley and Lindsey.
 

 ¶ 18. Next, Dale and Cathy argue that they should have been appointed legal counsel because their case presented specially troublesome points of law. Dale and Cathy specifically allege that Wesley and Lindsey violated numerous rules of discovery, including the failure to designate their expert witnesses sixty days prior to the hearing. Dale and Cathy assert that if discovery procedures are not followed during a termination of parental rights proceeding, the aggrieved party would necessarily be deprived of due process in violation of the Fourteenth Amendment.
 

 ¶ 19. Wesley and Lindsey argue that none of the procedural issues mentioned by Dale and Cathy were especially troublesome, and Wesley and Lindsey again assert that the expert witnesses testified about their own factual observations and the current health and well-being of the children while in their care to evaluate prospective placement of the children. The expert witnesses were not evaluating or testifying regarding Dale and Cathy’s fitness as parents. We agree that this case did not present any troublesome points of law, but rather focused on the well-being and general welfare of the children while in Wesley and Lindsey’s care.
 

 ¶ 20. In turning to the final factor, Dale and Cathy submit that having an attorney would have made a determinative different in the outcome of the case. Dale and Cathy claim that an attorney could have (1) advised them not to testify so as to preserve their rights under the Fifth Amendment, (2) objected to the testimony of the expert witnesses since they were not designated, (3) objected to the evidence derived from subpoenas duces tecum since they were issued beyond the discovery period, (4) objected to the authenticity of documents from the Georgia courts, and (5) objected to the hearsay testimony of the guardian ad litem and other witnesses.
 

 ¶ 21. However, as stated, the record reflects that the Clayton County Juvenile Court had already adjudicated Dale and Cathy to be unfit parents. The bench order granting Wesley and Lindsey legal custody of the Williams children states that “[r]e-unification efforts would be detrimental to the [children] and that it is best suited for the [children] to be placed in the legal/custody permanent guardianship of Wesley and Lindsey Williams until the child reaches the age of majority.” Mississippi Rule of Evidence 901(b)(7) allows the admission of public records upon
 
 *788
 
 proof that the public recorded documents are from the public office where items of that nature are kept. Since the chancellor requested the Clayton County Juvenile Court records from the Georgia Department of Family and Children’s Services office, and since these records constituted public records pursuant to Rule 901(b)(7), we find no abuse of discretion for the chancellor to admit those documents into evidence.
 
 See McIlwain v. State,
 
 700 So.2d 586, 590-91 (¶¶ 17-22) (Miss.1997).
 

 ¶ 22. We also note that the record reflects that the chancellor fully explained the process of the proceedings to both Dale and Cathy. The record reflects that both parties testified and fully participated in the hearing. During the hearing, Dale objected to various statements and evidence and he also cross-examined witnesses.
 

 ¶23. Additionally, the evidence and testimony presented at the termination hearing overwhelmingly supported the chancellor’s decision to terminate Dale and Cathy’s parental rights. The chancellor found, after reviewing court documents from Georgia and hearing testimony, that Dale and Cathy have rarely contributed financially to the care, support, or maintenance of the children since June 2007. According to the guardian ad litem’s testimony and report, the children shared with her that they were repeatedly sexually abused by their biological parents and lived in unsanitary conditions. The guardian ad litem testified that the children showed no interest in returning to the custody of their biological parents. Smith and Teague also corroborated that the children had relayed numerous instances of horrific sexual abuse, and Smith and Teague also stated that the children exhibited detrimental mental, physical, and emotional effects from the abuse. The guardian ad litem opined that reunification with the biological parents would be so detrimental to the children that they could possibly never recover.
 

 ¶ 24. After reviewing the record, we find that the evidence supporting the chancellor’s decision to terminate Dale and Cathy’s parental rights was so overwhelming that the presence of counsel would not have changed the outcome of the trial. As a result, we find that Dale and Cathy’s due process rights under the Fourteenth Amendment were not violated by the chancery court when it did not appoint them counsel in the parental rights termination hearing. Therefore, the judgment of the Lowndes County Chancery Court is affirmed.
 

 ¶ 25. THE JUDGMENT OF THE LOWNDES COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, MAXWELL AND RUSSELL, JJ., CONCUR. MYERS, J., NOT PARTICIPATING.
 

 [1]
 

 . Because of the confidential nature of this case and in order to protect the privacy of the minor children involved, we have used fictitious names for the parties and for the minor children.
 

 [2]
 

 . In addition to the six children named in this appeal, the appellants also have three additional children, who are not the subjects of this proceeding.
 

 [3]
 

 . Cathy also testified that she and Dale spend approximately $600 a month on cigarettes and energy drinks.